**ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**MILES & STOCKBRIDGE, P.C., et al., Defendants.**

No. CIV.A. S–99–1351.

United States District Court,
D. Maryland,
Northern Division.

March 13, 2001.

Mitchell A. Stearn, porter Wright Morris & Arthur, LLP, Washington, DC, Virginia Elizabeth Richards, Law Office, Washington, DC, for Plaintiff.

William J. Murphy, Baltimore, MD, Robert T. Shaffer, III, Murphy & Shaffer, Baltimore, MD, Alvin I. Frederick, James Edward Dickerman, Eccleston and Wolf, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION AND ORDER

SMALKIN, District Judge.

This professional malpractice action is before the Court as a result of numerous procedural errors in what should have been a run-of-the-mill asbestos case. The comedy (or, perhaps, tragedy) of errors that occurred here allowed a plaintiff—who at one time was prepared to accept a settlement of $125,000 [1]—to collect $1.6 million in an asbestos lawsuit that was barred by limitations, res judicata, and a general release executed by the plaintiff in a prior lawsuit! In the wake of this monstrosity, the parties footing the bill and successive sets of lawyers are slinging the barbs of blame at one another. They have filed motions in support of their positions.

---

1. Deposition of John Amato, IV, at p. 159–60.

Three separate summary judgment motions are now before the Court. Royal Insurance Company of America ("Royal") moves for summary judgment against Miles & Stockbridge ("Miles"), alleging that Miles was negligent in representing Royal's insured, Salomon, Inc. ("Salomon"), in an asbestos lawsuit brought by Corinne Jerome ("Jerome"). Royal's and Salomon's interests are identical for the purposes of this suit. Royal alleges that Miles's negligence caused Royal to pay out the $1.6 million settlement. Specifically, Royal claims that Miles was negligent in failing to respond timely to Jerome's complaint, causing a second default judgment to be entered against Salomon, and in failing to timely identify third-party defendants, thereby precluding Salomon from seeking contribution from joint tortfeasors.

Miles concedes that it was negligent in failing to respond to Jerome's complaint, and in failing to argue the appropriate standard for setting aside a default judgment. Nevertheless, Miles contends that Royal was contributorily negligent in handling the settlement of the *Jerome* case after discovering that Jerome had executed a general release in earlier litigation, precluding her from suing Salomon. Miles maintains that Royal should have sought to have the default judgment set aside, or challenged the default judgment on appeal, instead of entering into a $1.6 million settlement. Miles further contends that Royal's negligent decision to withhold authorization to accept Jerome's May 22, 1998 settlement offer for $450,000 was a superseding cause, absolving Miles from liability for any damages over $450,000. Finally, Miles denies that it was negligent in failing to file third-party claims. In particular, it claims that it did not file third-party claims at Salomon's express direction. Miles moves for summary judgment on all of these issues.

Parler & Wobber ("Parler"), successor counsel to Royal/Salomon, and a third-party defendant here, also moves for summary judgment, claiming that it is not, as a matter of law, liable to Miles for indemnification or contribution as a joint tortfeasor based on its representation of Royal/Salomon, after Royal discharged Miles.

For reasons discussed below, Royal's Motion for Summary Judgment on the issue of third-party claims is DENIED. On all other claims, Royal's Motion for Summary Judgment is GRANTED. Miles's Motion of Summary on the issue of third-party claims is GRANTED. On all other claims, Miles's Motion for Summary Judgment is DENIED. Finally, on the issue of indemnification, Parler's Motion for Summary Judgment is GRANTED. On the issue of contribution, Parler's Motion for Summary Judgment is DENIED.

## INTRODUCTION

The following recitation of facts will demonstrate, above all else, the need for developing less complex and more responsive and responsible ways of sorting out the blame and cost for industrial-age ills such as asbestosis than a system of litigation meant to sort out competing claims to straying cattle. Yet, the system lumbers on because no one has the incentive or initiative to change it, perhaps because everyone is so invested in the *status quo*. But, one digresses too easily. On to the facts.

## BACKGROUND

Royal, the plaintiff in this case, hired Miles to defend its insured, Salomon, in a lawsuit brought by Corinne Jerome in Baltimore City Circuit Court, seeking recovery of compensatory and punitive damages for the asbestos-related death of her husband, Theodore Jerome. Jerome also filed a nearly identical action [2] in the New York Supreme Court, which was pending at the time Jerome filed the Maryland action. The New York Supreme Court dismissed

---

**2.** In the Maryland action, Jerome asserted a survival claim only. In the New York action, however, Jerome asserted both a survival claim and a wrongful death claim.

Jerome's action, pursuant to Salomon's motion, based on the defense of statute of limitations. Meanwhile, the summons and complaint in the Maryland action were served on Salomon's resident agent and sent to Salomon. The first of the series of deplorable errors giving birth to this Frankenstein occurred when Salomon's mail room failed to forward the summons and complaint to Salomon's legal department. Consequently, Salomon did not file a response to the complaint and, upon Jerome's request, the Baltimore City Circuit Court issued on order of default against Salomon for failure to plead. Salomon then contacted Royal, who took over the defense of the Maryland action.

Almost immediately after taking over the defense of Jerome's Maryland lawsuit, Royal contacted Mauricio Barreiro, Esq., of Miles, and arranged for him and his firm to represent Salomon in the Maryland lawsuit. Miles successfully petitioned the circuit court to vacate the order of default issued against Salomon. In its order granting Salomon's motion to vacate the order of default, the court gave Salomon twenty-one days to respond to Jerome's complaint.

With knowledge that it had twenty-one days to respond to Salomon's complaint, and aware that service had been effected on Salomon eight months earlier, Mr. Barreiro removed the case to this Court. While the case was here, Mr. Barreiro chose not to file a responsive pleading, as required by Federal Rule of Civil Procedure 81(c) and the circuit court's order vacating the first default, and ignored the admonition of Mr. Amato, counsel for Jerome, to remand the case voluntarily because remand was improper. This decision started a chain reaction of errors, leading to the present action.

Just as Mr. Amato had promised, he filed a motion for remand due to improper removal. Judge Blake granted Mr. Amato's motion on behalf of Jerome, and refused Mr. Barreiro's request for ten additional days after remand to respond to Jerome's complaint. Because no responsive pleading had been filed within the time provided by the circuit court, Jerome filed a motion for default judgment there. The next day, Miles finally filed an answer to Jerome's complaint asserting defenses based on the statute of limitations, collateral estoppel, and *res judicata*. Miles also filed an opposition to Jerome's motion for default judgment, wherein it argued that an order of default was inappropriate because the circuit court was divested of jurisdiction while the case was pending in federal court, and thus, the time period for filing an answer in circuit court was stayed until the case was remanded. Miles also set forth several meritorious defenses to Jerome's action and stated that Jerome would suffer no prejudice if the court refused to enter a default judgment.[3]

On May 8, 1998, Judge Angeletti, of the Baltimore City Circuit Court, granted Jerome's motion and entered a judgment of default against Salomon, directing that the case be scheduled for trial on the issue of damages only. The issuance of the default judgment was not, however, in compliance with Md. Rule 2–613. This procedural error confounded the very straightforward and structured process set forth in Rule 2–613 for dealing with an order of default, and led to a series of misguided arguments by Miles in an attempt to set aside the judgment. Instead of challenging the procedural validity of the default judgment, Miles moved to vacate the default judgment in accordance with Rule 2–613(d), which provides that a defendant may move

---

**3.** Although Miles set forth several meritorious defenses in Salomon's opposition to the motion for a default judgment, in correspondence to Royal, Mr. Barreiro erroneously explained that the *Jerome* litigation was on the inactive docket, and that further discovery was necessary before any action could be taken. He further stated that the dismissal of the New York action would have no effect on the Maryland action, when, in fact, Miles could have filed a motion to dismiss the Maryland action based on the preclusive effect of the New York judgment.

to vacate an order of default within thirty days of its entry by motion stating the reasons for the failure to plead and the legal and factual bases for the defense to the claim. But, because Judge Angeletti issued a default *judgment* instead of a mere order of default, Miles assumed 2–613(g)[4] precluded revision of the judgment absent fraud, mistake or irregularity. Thus, Miles argued that the default judgment should be revised pursuant to Rule 2–535(b)[5], because of a jurisdictional mistake. Miles contended that the state court had no jurisdiction while the case was pending in federal court, and that the twenty-one day period to respond to the complaint, ordered by the circuit court judge who vacated the first default, was tolled until the case was remanded. Miles later discovered that it erred in assuming that Rule 2–613(g) precluded revision of a judgment absent fraud, mistake, or irregularity, and realized that it should have argued that the judgment was an interlocutory order that could be set aside based on a more liberal standard.

Shortly after Judge Angeletti entered the default judgment, Mr. Amato contacted Mr. Barreiro and offered to settle the Jerome case for $450,000. At the time of this settlement offer, the motion to vacate the default judgment was still outstanding. The offer was conveyed to Royal, which decided not to settle the case at that time.

On August 11, 1998, Judge Angeletti denied Salomon's motion to vacate without holding a hearing as provided in Md. Rule 2–311(f). Judge Angeletti rejected the argument that the twenty-one day period for answering was tolled while the case was pending in federal court. He also explained that, while the circuit court lacked jurisdiction when the case was pending in federal court, once the case was remanded back to state court, that court reacquired jurisdiction and had the authority to issue the

default judgment because Miles did not file a responsive pleading.

Two days after Judge Angeletti denied Miles's motion to vacate the default judgment, Mr. Amato offered to settle the case for $1.5 million. The offer remained open for thirty days, but Royal declined to accepted it.

In the meantime, the deadline set forth in the scheduling order for identifying third-party defendants was five weeks away. Miles alleges that Arnold Olshin, the in-house environmental claims counsel at Salomon, instructed Miles not to file any third-party claims, because he did not want to reveal the extent of Salomon's possible exposure to other asbestos claims. Royal denies that anyone from Salomon instructed Miles to forego the pursuit of third-party claims. It is undisputed, however, that Miles never identified possible third-party defendants in compliance with the scheduling order.

Royal discharged Mr. Barreiro and Miles at the end of September, 1998, hiring Parler to take over the representation of Salomon in the *Jerome* litigation. In an attempt to overcome the default judgment against Salomon, Parler filed a summary judgment motion based on the defense of *res judicata.* The court denied the motion and awarded attorney's fees to Jerome from Parler. Parler then filed a motion for reconsideration of the court's order, and separately moved to request permission to file third-party claims, as the filing deadline had already lapsed. The court denied Salomon's motion for reconsideration, and also denied the motion for leave to file third-party claims. The court, however, reversed its previous order awarding attorney's fees against Parler.

In early January, 1999, the parties convened for a settlement conference. Mr. Amato's settlement demand, on behalf of

---

**4.** Md. Rule 2–613(g) states that a default judgment entered in compliance with Rule 2–613 is not subject to the revisory power under Rule 2–535(a), except as to the relief granted.

**5.** Md. Rule 2–535(b) provides that the court may exercise revisory power and control over a judgment in case of fraud, mistake, or irregularity, upon motion of any party.

Jerome, was now $3 million. Judge Rombro, who oversaw the settlement conference, suggested that Mr. Barreiro attend the discussions. Thereafter, representatives of Royal, Salomon, Miles, and Miles's malpractice carrier met at Miles's Baltimore office to discuss the *Jerome* case. At the meeting, the parties discussed the possibility of filing a writ of mandamus to challenge the default judgment. Miles suggested that it might not be well-advised for it to participate in the settlement conference, because Jerome might perceive Miles's involvement as an opportunity to pursue an inflated settlement. Near the time of this meeting, an attorney at Miles learned of, and obtained, a copy of a general release executed by Jerome in earlier litigation with the Vermont Asbestos Group. This release apparently precluded Jerome from filing claims relating to the alleged asbestos-related death of her husband against Salomon. Miles immediately forwarded this release to Parler. On January 15, 1999, Parler filed another summary judgment motion based on the general release. Parler also filed a petition for writ of mandamus with the Court of Appeals based on the preclusive effect of Maryland's borrowing statute.[6] The Court of Appeals summarily denied this petition.[7]

Prior to the scheduled resumption of settlement discussions with Judge Rombro, representatives of Salomon and Royal, and Mr. Amato, continued to try to negotiate a settlement. After the Court of Appeals denied Parler's petition for a writ of mandamus, Parler offered $1.2 million to settle the case. Mr. Amato countered with a demand of $2 million, and, after further negotiation, the parties agreed to settle the matter for $1.6 million. At the time of settlement, the circuit court had not yet ruled on the summary judgment motion based on the general release. Royal timely commenced this diversity malpractice action against Miles, seeking to shift the settlement cost.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushi-*

---

6. Md.Code Ann., Cts & Jud. Proc. § 5–115(b) precludes an out-of-state resident from bringing an action in Maryland for personal injury, caused by a defective product, against a manufacturer or seller, if the injury occurred in a foreign jurisdiction whose statute of limitations bars the suit.

7. Miles does not argue in its motion for summary judgment that the Court of Appeals would have decided the petition for a writ of mandamus differently had Parler articulated the proper standard for review of the default judgment. The only mention of the Court of Appeals' decision on the petition for writ of mandamus is found in Miles's opposition to Royal's motion for summary judgment, wherein Miles states "a better-reasoned petition focusing on the issues that Miles & Stockbridge attorneys had actually articulated may have fared better." Miles's Opposition Memorandum, at p. 10. As Miles presented no evidence that the Court of Appeals would have made a different decision had Parler filed a better-reasoned petition, the Court will not consider this issue.

ta Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 253, 106 S.Ct. 2505.

## ANALYSIS

### I. Royal's and Miles's Cross Motions for Summary Judgment

■ To sustain a claim of legal malpractice, the claimant must prove that: (1) the attorney's employment by the client created a duty of reasonable care; (2) the attorney breached the standard of care; (3) the client suffered actual injury; and, (4) the attorney's breach proximately caused the injury. *See Hooper v. Gill*, 79 Md.App. 437, 440, 557 A.2d 1349 (1989). Miles concedes that it breached the standard of care in failing to respond to the *Jerome* complaint, thereby causing the default judgment. Notwithstanding this concession, Miles moves· for summary judgment, and opposes Royal's motion for summary judgment, on the grounds of contributory negligence and lack of causation. These defenses, however, do not preclude summary judgment in favor of Royal.

### A. Contributory Negligence/Failure to Mitigate Damages

Miles argues that Royal was contributorily negligent in settling the *Jerome* case for $1.6 million, because there was a substantial probability that the circuit court would have granted the pending summary judgment motion concerning the general release in Salomon's favor, or that an appeal of the circuit court's decision to issue, and uphold, the default judgment would have been successful. Without discussing, in this section of this opinion, the accuracy of Miles's argument concerning the suc-

cess of the summary judgment motion, or the success of an appeal, the Court rejects Miles's assertion that Royal was contributorily negligent.

■ First, assuming the facts and all inferences therefrom in the light most favorable to Miles, the defense of contributory negligence is not available because any negligence on the part of Royal occurred well after Miles's negligence. Contributory negligence is an absolute defense when a plaintiff's negligence occurs either before, or at the time of, the defendant's wrongful act or omission to produce the injury alleged by the plaintiff. *See Rogers v. Frush*, 257 Md. 233, 241, 262 A.2d 549 (1970). *See also Hummer v. Pulley, Watson, King & Lischer, P.A.*, 536 S.E.2d 349, 354 (2000). In *Hummer*, the plaintiff in a legal malpractice case was injured when his attorney failed to mail a letter requesting review of a high school superintendent's recommendation that the plaintiff be dismissed from his position as a teacher. *Id.* at 354. In his defense, the attorney argued that the plaintiff should have filed a petition for judicial review that the attorney subsequently prepared and sent to the plaintiff for filing. *Id.* As the plaintiff's original injury was caused by the attorney's failure to send the request letter, the court held that the plaintiff's subsequent decision not to file the petition for judicial review could be the basis of a claim for failure to mitigate the damages caused by the attorney's negligence, but not the basis of a claim for contributory negligence. *Id.*

■ Similarly, in this case, Miles's negligence caused the original injury to Royal/Salomon—the default judgment. The conduct that Miles argues constituted contributory negligence—namely, settlement of the Jerome claim for $1.6 million—occurred well after Miles's negligence. *See* Miles's Motion for Summary Judgment, p. 18 ("[ ]Royal's principal acts of negligence occurred after it had discharged Miles & Stockbridge."). Thus, while Miles may argue that Royal failed to mitigate its dam-

ages, Miles's argument that Royal was contributorily negligent is misplaced.

■ Second, even if this Court were to find that the defense of contributory negligence was available in these circumstances, Royal would still prevail on its claim of negligence, because Royal was entitled to rely reasonably, and did in fact rely reasonably, on its counsel's advice in deciding to settle the *Jerome* case.

Miles concedes in its motion for summary judgment that a client ordinarily has a right to rely on an attorney's skill and care during the representation, and therefore has a relaxed duty of inquiry regarding an attorney's error. *See* Miles's Memorandum in Support of its Motion for Summary Judgment, p. 18. *See also Simmons v. Urquhart*, 106 Md.App. 77, 90, 664 A.2d 27 (1995) (finding no contributory negligence where a patient followed a doctor's instructions and relied on a doctor's advice). It argues, however, that "Royal's decision to discharge Miles & Stockbridge and retain new counsel ... separates this case from the vast majority of legal malpractice cases in which the attorney relies on defenses of contributory negligence." Miles's Memorandum in Support of its Motion for Summary Judgment, at p. 18. Miles reasons that because Royal's alleged negligence occurred after it discharged Miles, its conduct was not protected by the "safe harbor" of reliance on professional advice. *Id.* This reasoning is flawed. Royal was entitled to rely on the advice of *an* attorney during the settlement negotiations. This fact does not change just because Royal discharged Miles and retained Parler as new counsel. This Court agrees with Royal's position

that the "relaxed rule" of contributory negligence in cases of reliance on professional judgment requires only that the client show that it reasonably relied on its attorney's advice at the time it made the decision in dispute. For Miles's argument to prevail, and to make any sense, it would have to show that Royal's decision to settle the *Jerome* litigation was an independent decision, made without the consultation and advice of Parler. Royal hired Parler, however, for the very purpose of providing legal advice, just as it had initially hired Miles for legal advice. While Royal may be a sophisticated client, this Court finds it difficult to believe that Royal would incur substantial legal fees without intending to rely on the advice of the attorney it hired. More telling, Miles has essentially conceded that Royal relied on the advice of Parler in deciding to settle. *See* Miles's Motion for Summary Judgment, at p. 13 ("Mr. Parler ... testified that he ... obtained the view that the case had a settlement value of from $2 million to $3 million ... Mr. Reed, Royal's claims representative, accepted that advice."). Moreover, this is not a case where the attorney's advice was so outside the realm of reasonable advice that fault could be attributed to the client for accepting, and relying on, it [8]. *See Wegad v. Howard Street Jewelers*, 326 Md. 409, 419, 605 A.2d 123 (1992) (stating that a client's reliance on a professional's advice must be reasonable).

■ This analysis also applies to any allegation that Royal failed to mitigate its damages. In its opposition memorandum, Miles claims that Royal had a duty to mitigate its damages by contesting the erroneous and unlawful default judgment.

---

**8.** Miles boldly suggests that Royal was willing to settle for such a high amount because it knew it had a cause of action against Miles for malpractice, and could recover any settlement amount from Miles. The only evidence Miles offers to support this conclusion is a statement by Mr. Amato that the case was a "freebie" for Royal, and that he would be Royal's best witness. *See* Amato Deposition, at p. 345–46; Letter from O'Brien to Reed,

dated January 11, 1998. Mr. Reed, the claims representative from Royal, however, made clear in his testimony that Royal did not view the case as a "freebie." Reed Deposition, at p. 165–66. Mr. Amato has no personal knowledge of how Royal viewed the settlement. Evidence as to Mr. Amato's view of the settlement is thus irrelevant, and will be disregarded.

Under Maryland law, a party does have a duty to mitigate damages under the doctrine of avoidable consequences. *See Sergeant Co. v. Pickett,* 285 Md. 186, 188–89, 401 A.2d 651 (1979). Miles cites *Pine Street Trading Corp. v. Farrell Lines, Inc.,* 278 Md. 363, 364 A.2d 1103 (1976), to support its argument that by failing to appeal the default judgment, Royal did not satisfy its duty to mitigate damages. In *Pine,* a sugar purchaser sued its supplier for negligence after a sugar shipment was condemned by the FDA on the ground that it was adulterated with a poisonous substance. *Id.* at 368, 364 A.2d 1103. The court allowed the jury to consider the purchaser's failure to contest the validity of the condemnation when considering damages. *Id.* at 368–69, 364 A.2d 1103. Miles also cites to cases from other jurisdictions to show that an attorney in a legal malpractice action may argue that a client failed to mitigate its damages when the client chose not to pursue a certain litigation remedy after discharging the attorney. *See, Schauer v. Joyce,* 54 N.Y.2d 1, 444 N.Y.S.2d 564, 429 N.E.2d 83 (1981); *Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d 834, 468 N.Y.S.2d 895 (1983); and *Swanson v. Sheppard,* 445 N.W.2d 654 (N.D.1989). In citing these cases, however, Miles overlooks that none involved a client who relied on the advice of counsel before deciding what action to take after an injury occurred. As stated above, Royal justifiably relied on the advice of Parler when it settled for $1.6 million. Miles acknowledged in its motion for summary judgment that clients are ordinarily insulated from liability for negligence if they reasonable rely on the advice of a professional. Thus, Royal bears no responsibility for failure to mitigate its damages, because it reasonably relied on the advice of Parler.

### B. Causation

Miles's second basis for summary judgment is that Royal caused it own damages by refusing to settle early on for $450,000, and for authorizing settlement for $1.6 million when an appeal would likely have been successful. The argument that Miles's conduct was not the proximate cause of Royal's injury is misplaced, however, and ignores well-settled principles of causation.

There are two subparts to the element of proximate cause: cause in fact, and legal cause, of the injury. *See Yonce v. SmithKline Labs.,* 111 Md.App. 124, 137, 680 A.2d 569 (1996). There are also two tests for determining whether a person's negligence was the cause in fact of another's injury—the "but for" and "substantial factor" tests. *Id.* at 138, 680 A.2d 569. The "but for" test applies when the injury would not have occurred absent the defendant's negligence. *Id.* The "substantial factor" test applies in situations where two independent causes concur to bring about an injury, and either cause, standing alone, would have generated the same harm. *Id.* When two defendants commit negligent acts, each of which is a substantial factor in causing the harm, both defendants are generally liable for the full extent of the injury. *See Cooper v. Bikle,* 334 Md. 608, 619, 640 A.2d 1120 (1994). The Maryland legislature passed the Maryland Uniform Contribution Among Joint Tort–Feasors Act to allow a defendant tortfeasor held liable for a joint and several judgment to implead the second tortfeasor for contribution. *See Parler & Wobber v. Miles & Stockbridge,* 359 Md. 671, 686, 756 A.2d 526 (2000).

If causation in-fact exists, the inquiry proceeds to legal causation. *Yonce,* 111 Md.App. at 139, 680 A.2d 569. Legal causation is established if, at the time of the tortfeasor's negligent act, the tortfeasor "should have foreseen 'the general field of danger,' not necessarily the specific kind of harm to which the injured party would be subjected as a result of the defendant's negligence." *Id.* (quoting *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 337, 624 A.2d 496 (1993)). Foreseeability also determines whether an intervening cause, negligent or non-negligent,

constitutes a superseding cause that terminates the initial tortfeasor's liability. *Id.* at 140, 680 A.2d 569. The chain of causation is ordinarily not broken if the intervening occurrence " 'is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable; and the [initial tortfeasor's] negligence is an essential link in the chain.' " *Id.* (quoting *State ex rel. Schiller v. Hecht Co.,* 165 Md. 415, 169 A. 311 (1933)).

Foreseeability is normally a question of fact reserved for the jury. *Id.* at 141, 680 A.2d 569. When the facts are undisputed and susceptible of only one inference, however, the court decides the question of foreseeability as a matter of law. *Id.* Moreover, some courts submit the issue whether certain conduct constitutes a superseding cause to the jury only if the existence of the conduct is in dispute. *See* 1 R. Mallen and J. Smith, Legal Malpractice § 8.5, p. 814; *see also White v. Rolley,* 225 Ga.App. 467, 484 S.E.2d 83, 86 (1997).

This Court has found no Maryland case that addresses whether the negligence of a successor attorney is a superseding cause that relieves a negligent predecessor attorney from liability in a legal malpractice action. Nonetheless, it is well settled that the negligence of a medical professional in treating a person injured by a tortfeasor is not a superseding cause that absolves the initial tortfeasor from liability. *See Morgan v. Cohen,* 309 Md. 304, 310, 523 A.2d 1003 (1987)(stating the general rule that a negligent actor is liable for harm resulting from normal efforts of third persons in rendering aid, even if the third person is also negligent). Other jurisdictions that have addressed this issue analogize the situation to that of an injured person who exercises reasonable care in selecting a physician. *See Villarreal v. Cooper,* 673 S.W.2d 631, 633 (1984) ("We cannot distinguish between the foreseeability of negligent medical

treatment... and negligent legal representation."), *Cline v. Watkins,* 66 Cal. App.3d 174, 180, 135 Cal.Rptr. 838 (1977) ("As a negligent physician is not relieved of the consequences of his lack of care because a subsequently treating physician could have avoided the injury had he not also been negligent... so also should a negligent lawyer not be relieved because he is replaced by another."), *Wimsatt v. Haydon Oil Co.,* 414 S.W.2d 908, 912 (Ky. 1967) (comparing a client's use of ordinary care in selecting an attorney to a patient's use of ordinary care in selecting a physician). This analogy is appropriate. Miles does not claim that Royal failed to exercise reasonable care in selecting Parler as counsel. Thus, as a matter of law, any negligence on the part of Parler was foreseeable, and not a superseding cause absolving Miles from liability for its negligence.

Miles's causation argument is that Royal caused its own damages by declining to authorize settlement in response to Jerome's $450,000 offer, during the time that Miles represented it. This argument fails.

Both parties agree that, absent Miles's negligence, Salomon would have prevailed on a motion to dismiss the *Jerome* litigation and would have paid nothing in damages to Jerome. But, because of Miles's negligence, the circuit court entered a default judgment against Salomon and ordered a trial on damages. Even if Royal's/Salomon's refusal to accept the early settlement offer contributed to further injury, it did not break the chain of causation started by Miles. Just as a successor attorney's negligence is foreseeable, so is a client's subsequent negligence. Thus, the proper argument here is not that Royal's actions were a superseding cause breaking the chain of causation. Rather, the appropriate argument is that Royal failed to mitigate its damages by declining to authorize settlement.[9] A close look at

---

9. Royal does not allege, in its summary judgment motion, that Miles's conduct with re-

the facts regarding the May 1998 settlement offer shows, however, that Royal did not breach its duty to mitigate damages by declining to authorize settlement at that time.

On May 22, 1998, Mr. Amato contacted Mr. Barreiro and offered to settle the Jerome litigation for $450,000. Mr. Barreiro forwarded the settlement demand and supporting documentation to Royal and Salomon on May 28, 1998. Mr. Barreiro testified that he did not provide Royal with any analysis of the settlement documentation because Royal did not request one. Barreiro Deposition, at p. 592–93. Mr. Amato faxed a letter to Mr. Barreiro on June 1, 1998, stating that the May 22, 1998 offer would expire on June 4, 1998. Mr. Barreiro forwarded this letter to Royal, but again did not offer advice as to the offer. *See* Letter from Barreiro to Alford, dated June 1, 1998. Mr. Barreiro did state, however, that Miles "would be filing a motion to revise the judgment entered by Judge Angeletti over the next few days." *Id.* Mr. Barreiro also explained that:

> [i]t is our position that the plaintiff could not have suffered any prejudice by virtue of any of the procedural wranglings that have taken place in this case. Nevertheless, to the extent that Royal will be offering any money in this case, please advise me at your earliest convenience.

*Id.* On June 9, 1998, after the May 22, 1998 settlement offer for $450,000 had expired, Mr. Barreiro sent Royal a summary of the settlement documents and stated that "[w]ith damages the only issue that is currently available to be tried, this case appears to be a very poor case for the defense." *See* Letter from Barreiro to Alford, dated June 9, 1998. Notwithstanding this pessimistic viewpoint, Mr. Barreiro testified that he did not feel that an express suggestion to settle was necessary.

Barreiro Deposition, at p. 621. Instead, Mr. Barreiro reiterated that Miles had filed a motion to revise the judgment, and had requested a hearing. Letter from Barreiro to Alford, dated June 9, 1998. He further stated that he hoped Judge Angeletti would allow Miles to assert the defense of statute of limitations. *Id.* Prior to this letter, Penelope Alford testified that Mr. Barreiro stated that he thought he could successfully persuade Judge Angeletti to vacate the default judgment. Alford Deposition, at p. 301.

Miles argues that the June 4, 1998 deadline was not firm. It further contends that Royal, as a major insurance company, was capable of responding to Jerome's settlement demand without settlement analysis from Miles, and that its knowing and voluntary decision to forego settlement at that time precludes it from recovering any more than $450,000 in its malpractice claim.

First, there is no evidence that the June 4, 1998 deadline established by Jerome was not firm. Ms. Alford testified that she neither thought that Mr. Amato's deadline was serious, nor thought that it was puffery. Alford Deposition, at p. 258. There is no testimony, however, from Mr. Amato, the party who made the offer, that his offer was not in fact firm. Nor does Ms. Alford claim that Mr. Amato told her that the deadline was flexible. Ms. Alford's testimony as to whether or not the settlement expiration date was absolute is pure speculation, and is thus inadmissible evidence. Fed.R.Evid. 602. Thus, as Miles did not state that the case was "very poor for the defense" until June 9, 1998, it cannot argue that Royal should have accepted the offer that expired on June 4, 1998. In correspondence prior to June 4, 1998, Mr. Barreiro stated that he was filing a motion to revise the default judgment and that its position was that Jerome

---

gard to settlement negotiations was negligent. While it discusses Miles's alleged mishandling of settlement negotiations in its statement of facts, it does not base its negligence claim on

this particular conduct. Instead, its negligence claim is based on Miles's failure to file an answer to the complaint and Miles's failure to identify third-party defendants.

suffered no prejudice as a result of the failure to respond to the complaint. Based on this correspondence, Royal's rejection of the settlement offer was reasonable, because the circuit court had not yet ruled on the motion to revise, and there was still a possibility that Salomon could assert its absolute defenses and obtain an order of dismissal. No reasonable fact finder could find that Royal was negligent in declining to accept the May 22, 1998 offer. Accordingly, Royal did not breach its duty to mitigate damages.

Even if the deadline was not firm, however, Royal still acted reasonably in not accepting the settlement offer, because Miles did not provide a dollar figure for a reasonable settlement as requested by Royal in its July 14, 1998 letter to Mr. Barreiro. In communications after June 9, 1998, Miles indicated that the circuit court would most likely grant the default judgment. Thus, arguably, Royal should have seriously considered settlement. Miles, however, did not provide advice as to what a reasonable offer would be, and never suggested that Royal should accept the $450,000 offer from Jerome. In a July 14, 1998 letter to Mr. Barreiro, Ms. Alford wrote: "You agreed to find out about prior settlements and summarize your evaluation of the dollar worth of the claim. Please convey your findings to [me], as soon as possible." Miles does not direct the Court to any evidence that it, in fact, provided this advice. Instead, Miles states in its opposition memorandum that Royal "ignores the fact that [Mr. Barreiro] did provide a detailed analysis on June 9, 1998 ... and that Ms. Alford never pressed for anything further." Miles's Opposition Memorandum, p. 7. The July 14, 1998 re-

quest from Alford contradicts this assertion.

Miles also contends that Royal should have responded to the settlement demand without settlement analysis from Miles, because it is a major insurance company familiar with settlement. This argument overlooks the very important fact that Royal hired Miles to represent it, and specifically requested a settlement evaluation on July 14, 1998. Thus, even if the settlement offer at issue did not expire on June 4, 1998, Royal requested, and did not receive, advice from Miles, its counsel, concerning an appropriate amount for settlement. Consequently, no reasonable fact finder could conclude that Royal failed to mitigate its damages in declining to accept the May 22, 1998 settlement offer.[10]

## C. Third-party Claims

■ Royal claims that Miles was negligent in failing to designate timely possible third-party defendants, thereby precluding Salomon from obtaining contribution from parties with whom Jerome had previously settled. Miles opposes Royal's motion for summary judgment, and moves for summary judgment itself, on the basis that Salomon instructed Miles not to designate third-party defendants, because Salomon would have been required to provide discovery information that would have disclosed extensive involvement by Salomon's predecessor, Philipp Brothers, in asbestos distribution. To support this allegation, Miles offered the testimony of Mr. Barreiro, who stated that Arnold Olshin and Timothy O'Donnell, representatives of Salomon, instructed him not to answer interrogatories regarding third-party defendants. Barreiro Deposition, at p. 684–86. Mr.

---

**10.** Miles opines that Royal chose not to settle in June, 1998 because Royal was "calculating whether its malpractice claim would be better or worse following resolution of the motion to vacate." *See* Miles & Stockbridge's Reply Memorandum, at 15. This argument is unsupported by the evidence and is without merit. Royal could have brought a malpractice action for $450,000, had it decided to

accept the May 1998 settlement. Miles concedes this in its reply memorandum in which it requests this Court to limit damages against Miles to $450,000. It is hard to see any benefit to Royal in awaiting the outcome of the motion to vacate, and then bringing an action for a higher amount, when it could have settled and brought an action for $450,000.

O'Donnell testified that he did not recall why Salomon elected not to answer interrogatories regarding third-party defendants; however, he did acknowledge signing the interrogatories wherein Salomon elected not to answer questions concerning third-party claims. O'Donnell Deposition, at p. 275–77. There is no testimony from Mr. Olshin as he is deceased.

Royal offers no independent evidence to counter Miles's contention that Salomon instructed Miles not to designate third-party defendants. Instead, it argues that O'Donnell's testimony does not support Miles's contention, because he does not recall why interrogatories regarding third-party defendants were not answered. In addition, Royal questions the credibility of Mr. Barreiro's testimony.

In a legal malpractice case, expert testimony is ordinarily required to establish a breach of the standard of care, except in cases " 'where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.' " *Hooper v. Gill*, 79 Md. App. 437, 441, 557 A.2d 1349 (1989); *see also Briggs v. Cochran*, 17 F.Supp.2d 453, 461 (D.Md.1998) (granting summary judgment for attorney where plaintiff did not provide expert testimony as to causation in legal malpractice case). In this case, a jury would not be able to infer negligence from Miles's decision not to file third-party claims based solely on the jury members' common experiences. Expert testimony is therefore required.

The allegations of negligence concerning the failure to file third-party claims in Royal's summary judgment motion are conclusory and unsupported by expert testimony. Royal simply alleges that Miles's decision not to designate third-party defendants was negligent, and that, even if Mr. Olshin instructed Miles not to pursue third-party defendants, Miles was negligent in failing to consult with Royal before abandoning. third-party claims. Without evidence showing that the failure to consult Royal regarding the designation of third-party claims was a breach of the standard of care, Royal's claim that Miles was negligent with regard to third-party claims fails as a matter of law.

## II. Parler & Wobber's Motion for Summary Judgment

Miles filed a third-party complaint against Parler requesting indemnification or contribution for any judgment awarded against it in the action brought by Royal.[11] Miles alleges that Parler was negligent in representing Salomon because it failed to argue the appropriate standard for vacating a default judgment to the circuit court, failed to file third-party complaints before the October 5, 1998 deadline, and negligently advised Royal to settle the Jerome matter in excess of a reasonable settlement value.

### A. Failure to argue the appropriate standard for vacating a default judgment to the circuit court.

In its summary judgment motion, Parler argues that, even if it was negligent in failing to argue the appropriate standard to the circuit court, Miles cannot prove that its action was the proximate cause of any damage to Royal. In particular, Parler maintains that Judge Angeletti would

11. The right of defendant in a legal malpractice action to obtain contribution or indemnification from a successor lawyer based on the successor lawyer's negligent representation of the same client in the same matter was not yet established under Maryland law until this case emerged. This Court certified the issue of contribution and indemnification to the court of appeals. After examining the public policy implications of allowing contribution, and evaluating the historical underpinnings of the Uniform Contribution Among Tort–Feasors Act, the court of appeals held that Maryland law allows an attorney to seek contribution from a successor attorney who negligently represented the same client in the same matter at issue in the malpractice suit. *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 705, 756 A.2d 526 (2000).

not have vacated the default judgment, even if Parler had presented a different motion or argument.

■ As discussed in *supra* section I, part B, causation is normally a question of fact reserved for the jury. *See Yonce*, 111 Md.App. at 139, 680 A.2d 569. The trial judge, however, decides the issue of proximate cause as a matter of law where the determination of proximate cause depends on whether the plaintiff in a malpractice action would have succeeded in the underlying action had the negligent attorney filed an appeal. *See Thomas v. Bethea*, 351 Md. 513, 533 n. 7, 718 A.2d 1187 (1998) (citing *Daugert v. Pappas*, 104 Wash.2d 254, 704 P.2d 600, 604 (1985)). The underlying rationale of this principle is that a judge is best suited to determine whether an appellate court would have granted a more favorable judgment for a client had its attorney filed an appeal, because that determination "depends on an analysis of the law..." *Daugert*, 704 P.2d at 604. This rule prevents a jury from "speculating over what an appellate court might have done by requiring the trial judge to make the determination..." *Id.* This principle also applies when the issue of causation depends on whether a petition for rehearing, reconsideration, or a writ would have been successful. *See* 4 R. Mallen and J. Smith, Legal Malpractice § 30.44, at 622–623 (5th ed.2000). In addition, because the issue of causation in this situation is one of law, expert testimony about what a court would have done is unnecessary. *Id.* at 623, 704 P.2d 600; *see also Dow Chemical Co. v. Ogletree, Deakins, Nash, Smoak & Stewart*, 237 Ga.App. 27, 514 S.E.2d 836, 839–40 (1999)(excluding expert testimony of a retired judge about what an appellate court would have decided).

■ Here, Miles argues that Judge Angeletti mistakenly believed that he could not vacate the default judgment because there was no finding of a jurisdictional mistake, as argued in Miles's motion to vacate[12], and that Judge Angeletti would certainly have vacated the default judgment against Salomon had Parler's motion articulated the appropriate standard for reviewing the interlocutory judgment. The Court disagrees.

In its motion to vacate, Miles did not challenge the propriety of the default judgment based on the circuit court's departure from the procedure required by Rule 2–613, or the failure of the circuit court to provide the required hearing under Md. Rule 2–311[13]. Instead, believing that a default *judgment* was entered instead of an *order* of default, and that Rule 2–613(g)[14] precluded revision of the default judgment except for fraud, mistake, or irregularity, Miles argued that the default judgment was a mistake because the circuit court lacked jurisdiction to enter the judgment. The circuit court rejected this argument without explaining that the judgment was interlocutory—not final—and without pointing out Miles's mistaken view

---

12. In the August 11, 1998 Order denying Salomon's Motion to Vacate the Default Judgment, Judge Angeletti wrote that "Salomon's failure to comply with Judge Rombro's Order, leaves this Court with no alternative but to deny their Motion to Vacate the second default judgment."

13. Md. Rule 3–111 provides that a court "may not render a decision that is dispositive of a claim or defense without a hearing if one was requested as provided in this section." Md. Rule 2–311(f).

14. Md. Rule 2–613(g) states that a default judgment entered in compliance with Rule 2–613 is not subject to the revisory power under Rule 2–535(a), except as to the relief granted. The Maryland Court of Appeals held, however, in *Banegura v. Taylor*, 312 Md. 609, 618–19, 541 A.2d 969 (1988), that a judgment of default cannot be appropriately entered until there has been satisfactory proof of damages. Until there is proof of damages, a default judgment is interlocutory and is subject to the general revisory power of Rule 2–535(a). *Id.* Thus, Rule 2–613(g) is not applicable to a default judgment unless and until damages are assessed against a defendant. *See Curry v. Hillcrest Clinic*, 337 Md. 412, 428, 653 A.2d 934 (1995).

that the circuit court could only revise the judgment for fraud, mistake, or irregularity.

At the time Parler took over the representation of Salomon, the thirty day period within which a defendant may file a motion to vacate an order of default had expired. Thus, any motion Parler filed thereafter would be evaluated as relating to an interlocutory order. This is significant because a judge has more discretion in the review of an interlocutory order than in the review of a decision to vacate an order of default. *See Banegura*, 312 Md. at 621, 541 A.2d 969 (explaining that discretion to vacate a default judgment is somewhat circumscribed by Rule 2–613). In an attempt to persuade the circuit court to vacate the default judgment, Parler filed a summary judgment motion based on the defense of *res judicata*. In its motion, however, Parler neither explicitly requested that the circuit court lift the default judgment, nor informed the circuit court of the interlocutory nature of the default judgment and the appropriate standard of review. Parler also filed a petition for writ of mandamus with the Court of Appeals and again argued the claim was barred by *res judicata*, without addressing the propriety of the default judgment. Upon discovery of the general release, Parler filed yet another summary judgment motion, but again failed to discuss the interlocutory order of default, or the standard for setting it aside.

Normally, in this situation, this Court would predict how the circuit court would have ruled had Parler filed a more appropriate motion. *See discussion, supra.* Both sides offer expert testimony about how the circuit court would have ruled had Parler argued its case more effectively. This testimony is unnecessary and irrelevant for two reasons. First, as explained above, expert testimony is inappropriate in situations such as this, where the issue of causation is decided as a matter of law. Second, because Judge Angeletti gave deposition testimony in this case, the Court

has the unique opportunity to know how he would have ruled had Parler presented more appropriate arguments in its motions.

Judge Angeletti's deposition testimony belies Miles's claim that he would have made a different decision had Parler informed him that the default judgment was an interlocutory order, subject to revision at any time before final judgment, or that Ms. Jerome executed a general release precluding future suit against Salomon. Judge Angeletti testified that, all along, he understood that he had the discretion to vacate the default until there was a trial for damages. *See* Angeletti Deposition, at p. 42. Moreover, he testified that there was no particular motion that Parler could have filed that would have convinced him to vacate the May 8, 1998 default. *Id.* Furthermore, Judge Angeletti acknowledged in his deposition testimony that he was aware of Salomon's meritorious defenses to the action at the time he issued the default order and at the time he denied Salomon's motion to vacate. *Id.* at 43. Most persuasive is the following testimony of Judge Angeletti, in response to a question about Maryland case law addressing the exercise of discretion when vacating a default judgment:

> I'm aware of what Henley [v. Prince George's County] holds though, that the Court's discretion must be exercised liberally, lest technicality triumph over justice. I'm also aware that when a plane is schedule [sic] to leave at 9:00 o'clock and you arrive at the gait [sic] at 2 minutes after 9:00 and the plane is gone they are not going to turn it around and say bring it back. I don't give a damn who you are. Especially, when it's the second plane, not the first plane.

*Id.* at 103.

The above quote, as well as the other testimony highlighted by the Court, unequivocally demonstrates that Judge Angeletti did not have the least intention to vacate the judgment, notwithstanding the fact that Salomon had several significant

defenses to the lawsuit that would have justified a dismissal of the suit, including a general release. Thus, even if Parler was negligent in filing the motions for summary judgment, its negligence did not cause damage to Royal.

Even without the benefit of Judge Angeletti's testimony, a close look at the motions filed in the attempt to have the default judgment vacated reveals the flaw in Miles's argument that a different motion would have fared better. In Salomon's opposition to the motion for a default judgment, Miles specified *res judicata* and statute of limitations as meritorious defenses to the lawsuit, and explained that Salomon failed to answer the complaint because of its mistaken belief that the time to answer was tolled while the case was pending in federal court. Under Rule 2–613, Judge Angeletti was required to vacate, or in this case, deny the motion for entry of a default judgment if he felt it was equitable.[15] He apparently thought it was not equitable and entered the default judgment. Miles's motion to vacate this default judgment raised no new *substantive* arguments. Rather, Miles's motion to vacate erroneously argued that there was a jurisdictional mistake that justified revision of the judgment under Rule 2–535. This argument was also rejected. But, even if Judge Angeletti had known that the order was interlocutory and subject to revision without a showing of fraud, mistake or irregularity, the arguments advanced by Miles in it opposition to the motion for a default judgment and in its motion to vacate, and by Parler in the motion for summary judgment, were essentially the same, namely, that the statute of limitations and *res judicata* barred the suit[16]. Moreover, Judge Angeletti had broader discretion to modify the ruling as an interlocutory order, because he was not bound by the requirements of Rule 2–316(e). *See Banegura*, 312 Md. at 621, 541 A.2d 969. Thus, if Judge Angeletti rejected these arguments under the more constricted standard of Rule 2–316, he would surely not then accept them under the more liberal standard afforded the review of an interlocutory order. In short, the fact that Miles argued the wrong procedural standard, and that Parler failed to bring this error to the attention of the circuit court, most likely had no bearing on the ultimate decision to enter, or to sustain, the default judgment against Salomon.

## B. Failure to file third-party claims within the scheduling order deadline

Miles seeks contribution from Parler, claiming that Parler could have *filed* third-party claims within the deadline, even though the initial deadline for *identifying* third-party defendants expired before Parler took over the representation of Salomon. Parler did, in fact, file a motion for leave to file a third-party complaint after the October 5, 1999 deadline for filing cross-claims and third-party claims. Miles claims that Judge Angeletti would have allowed Parler to file third-party claims

15. As Parler aptly points out in its motion for summary judgment, typically, a defendant first opposes a default judgment in a motion to vacate, after a court has entered an order of default. In this case, however, Miles filed an opposition to Jerome's motion for an entry of a default judgment wherein it raised arguments that are normally included in a motion to vacate, *to wit*, that there were meritorious defenses to the lawsuit and equitable reasons for the failure to plead. Upon review of this motion, although not technically a motion to vacate, Judge Angeletti was *required* to vacate the default if he found there was a substantial basis for an actual controversy as to the mer-

its and that it was equitable to excuse the failure to plead. Md. Rule 2–316(e).

16. Miles also maintains that Parler was negligent when it filed the second summary judgment motion, based on the release, because it again neglected to request the circuit court to first vacate the default judgment before granting summary judgment. Although the release was a new substantive defense, it was no more compelling than the defenses of *res judicata* and statute of limitations. Each could have served as a basis for dismissal of the case.

even though Miles did not identify possible third-party defendants in accordance with the notice provision in the scheduling order. Miles offers the testimony of one of its experts, F. Ford Loker, to support this argument. Loker stated that "there [wa]s no reason to believe that any party would have objected, or that any objection would have been given weight by the Circuit Court, if the Third–Party Complaints had been timely filed on or before October 5, 1998." This opinion is directly contradicted by Judge Angeletti's testimony. Judge Angeletti testified that the deadlines in the scheduling order were extremely important, and that the failure of a party to comply with the deadline to identify third-party defendants would preclude the party from filing a third-party complaint. *See* Angeletti Deposition, at p. 44–45. Thus, Judge Angeletti would not have allowed the filing of a third-party complaint, even if Parler filed it by October 5, 1998, due to Miles's decision not to identify third-party defendants within the time allowed in the scheduling order. Consequently, any negligence on the part of Parler did not proximately cause any harm to Royal.

In opposition to Parler's motion for summary judgment on the issue of third-party claims, Miles further contends that, even if Parler was precluded from filing third-party complaints because Miles did not comply with the designation deadline, Parler should have considered the option of obtaining credit for Jerome's prior settlements with other asbestos defendants when advising Royal and Salomon about settlement. Miles claims that New Jersey law would apply to the issue of credit for settlement. Miles cites to New Jersey case law that authorizes a non-settling party to seek credit from a settling defendant without filing an action in contribution, even if the settling defendant is not a party to the action. *See Carter v. University of Medicine & Dentistry*, 854 F.Supp. 310, 314–16 (D.N.J.1994), *Young v. Latta*, 123 N.J. 584, 589 A.2d 1020, 1026 (1991). While, under New Jersey law, Sa-

lomon was indeed eligible to seek a settlement credit from other defendants who settled with Jerome, the case law and relevant statute, N.J. R. Civ. P. 4:7–5, make clear that a defendant does not have "free rein to assert the liability of a settling defendant without first providing the plaintiff with fair and timely notice." *See Young*, 589 A.2d at 1026–27. The *Young* court explained that a "plaintiff should know as early in the case as possible whether a defendant will seek to prove the fault of a co-defendant" so that the plaintiff can conduct discovery accordingly. *Id.* at 1027. Thus, *Miles* would have been obligated to notify Jerome of its intention to pursue other defendants early in the litigation, and to allow discovery about other potential defendants, possibly exposing Salomon's predecessor's participation in the asbestos trade. This discovery, however, is precisely why Miles claims that Salomon did not want Miles to designate third-party defendants.

Miles has not shown that it complied with the notice requirements for obtaining a settlement credit. Moreover, the Court can infer that Miles did not comply with the notice requirements based on its justification for not designating third-party defendants. As Miles did not provide the requisite notice to Jerome, or allow discovery relating to possible third-party defendants, Parler would not have been eligible to seek credit for settlement. *See Young*, 589 A.2d at 1026–27. Thus, no reasonable fact finder could conclude that Parler was negligent in not considering the ability to obtain credit for settlement when preparing the case for trial, or in advising Royal and Salomon about settlement.

## C. Negligent advice regarding settlement

Miles's third basis for its claim of contribution against Parler is that Parler negligently advised Salomon to settle the Jerome litigation for the unreasonable amount of $1.6 million. Parler contends, in its summary judgment motion, that Miles cannot as a matter of law maintain

its claim for contribution based on negligent settlement advice. Specifically, Parler argues that its advice as to the settlement value of the case was reasonable in light of "subjective" considerations particular to Salomon, namely, the financial viability of Salomon and the effect negative publicity associated with an adverse verdict would have on its business, since it was engaged in a series of mergers around the time of the settlement. Parler cites the testimony of Miles's expert on settlement value, F. Ford Loker, to support its claim that Salomon's decision to settle for $1.6 million was reasonable, because it was based on risk tolerance. Mr. Loker testified that the likely verdict range of the Jerome case at trial was between $200,000 and $2,000,000, and that the chance of a verdict against Salomon was 90%. Loker Deposition, at p. 223–24. Moreover, he stated, in an opinion letter to Miles, that the average verdict for a mesothelioma case in Baltimore City was between $2,000,000 to $3,000,000. Thus, because the settlement for $1.6 million was less than both the highest potential verdict in the Jerome case (as predicted by Mr. Loker) and the average verdict for mesothelioma cases in Baltimore City, Parler contends that the settlement was an appropriate amount, particularly since Salomon was risk-adverse. Parler's assertion, however, that Salomon's concerns about negative publicity and financial viability played a significant role in its decision to recommend settlement for $1.6 million, is not supported by the record in this case.

Parler offers testimony of Ellen O'Brien, a representative from Salomon, to support its contention that its settlement recommendation was reasonable in light of Salomon's concern with financial viability and the effect of negative publicity on various mergers with which Salomon was involved. The testimony cited is equivocal at best. Ms. O'Brien testified that she indeed expressed concern to either Mr. Reed or Mr. Parler about punitive damages exposure. See O'Brien Deposition, at p. 333–34. Significantly, however, she testified that she never stated that Salomon wanted the case settled in part because of concern about punitive damages exposure. Id. Moreover, when asked about concern that a representative from Salomon might have to testify about the financial situation of the company, Ms. O'Brien testified that she recalled Interrogatories requesting names of financial representatives, but that she didn't remember any other concern. Id. She also stated that any merger with which Salomon was involved would have been finalized by the time settlement discussions started. Id.

Parler reiterates, in a footnote to its memorandum in support of its summary judgment motion, that Ellen O'Brien testified extensively that Salomon wanted to avoid a trial in the Jerome case for fear of adverse publicity and the effect a verdict would have on various corporate mergers in which Salomon was involved at the time. Yet, to support this particular assertion, Parler does not cite to the "extensive" testimony of Ellen O'Brien; rather, it cites to excerpts from the deposition of Mr. Parler, wherein he stated that Ellen O'Brien expressed concern to him about reporting the Jerome claim to her new supervisor, especially since there was a default judgment in place and it was unclear as to whether Salomon could present a defense about punitive damages. Parler Deposition, at p. 83. He further stated that he believed that Ellen O'Brien reiterated the concern about punitive damages before the settlement conference before Judge Rombro. Id. at 84.

The testimony of Mr. Parler and Ms. O'Brien regarding concern about punitive damages, does not create a genuine issue of fact about whether subjective factors justified Parler's $1.6 million settlement recommendation. While Mr. Parler testified that Ms. O'Brien expressed concern about punitive damages, he did not testify that she stated Salomon should settle the case because a punitive damages verdict

would be detrimental to the company. Most significant, Ms. O'Brien's own testimony discredits the argument that Salomon's concern about a large punitive damages verdict was a significant factor, or a factor at all, in its decision to settle. She testified that she never stated that Salomon wanted to settle because of concern about punitive damages. She also stated that the mergers with which Salomon was involved were finalized before settlement was reached. Ms. O'Brien's testimony belies Parler's claim that Salomon's fear of adverse publicity and a large punitive damages award justified Parler's advice to settle for $1.6 million.

In its memorandum in opposition to Parler's motion for summary judgment, Miles also argues that Parler was negligent in recommending a $1.6 million settlement because the chances of a successful appeal of the default judgment were very high. Thus, Miles contends that, even if Salomon wanted to avoid a damages verdict, and avoid the cost and burden of filing an appeal thereafter, the settlement recommendation of $1.6 million was unreasonable because Salomon would surely have prevailed on appeal. The Court agrees.

As mentioned in the background section of this opinion, the second default judgment entered against Salomon was procedurally defective. Md. Rule 2–613(b) provides that a court shall enter an *order* of default, upon request of a plaintiff, if the time for pleading has expired and a defendant has failed to plead. After entry of an order of default, the clerk must issue a notice informing the defendant that an order of default has been entered against him, and that he has thirty days to move to vacate the order. Md. Rule 2–613(c). If the defendant chooses to file a motion to vacate the order of default, the motion must state the reasons for the failure to plead, as well as the factual and legal bases for the defense to the suit. Md. Rule 2–613(d). Then, "if the court finds

that there is a substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead, the court *shall* vacate the order." Md. Rule 2–613(e) (emphasis added). Finally, if a court denies a defaulting party's motion to vacate, the court may enter a judgment by default only after it is satisfied that is has jurisdiction and that the required notice was sent to the defaulting party. Md. Rule 2–613(f). A court may not enter final judgment until it makes a determination as to the amount of damages, if any. *Id.; see also Curry*, 337 Md. at 427, 653 A.2d 934 (explaining that default judgment should not have been entered until there had been satisfactory proof of damages).

■ While a judge exercises some discretion when deciding whether to enter a default judgment against a party under Rule 2–613, this discretion is not unbridled. *See Banegura*, 312 Md. at 621, 541 A.2d 969. Rule 2–613(e) requires a court to vacate an order of default upon finding that there is a substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead. Md. R. 2–613(e). Thus, after an order of default is entered, but before a judgment of default is entered, a court cannot punish a party by refusing to vacate a default judgment, if there is a meritorious defense, and if it is equitable to excuse the party's error.

In this case, the circuit court undoubtedly erred in issuing a default *judgment* pursuant to Jerome's motion, instead of a default *order*. The court further erred in failing to provide notice to Salomon in compliance with Rule 2–613(c). Finally, the court erred in denying Salomon's request for a hearing in opposition to Jerome's motion to enter default judgment and on its motion to vacate.[17]

To find Parler liable for negligent settlement advice, Miles must prove causation

---

17. Because both decisions were dispositive of Salomon's defenses to the action, Judge Angeletti could not render them without a hearing. *See* Md. Rule 2–311(f).

by showing that Salomon would have obtained relief from the default judgment after remand to Judge Angeletti. *See Oteiza v. Braxton,* 547 So.2d 948, 950 (Fla. Dist.Ct.App.1989). On appeal, Salomon clearly would have prevailed based on the procedurally defective default judgment and the failure to hold hearing. The appellate court would have vacated the judgment and remanded the case to Judge Angeletti. On remand, he would have held a hearing on the motions. According to Judge Angeletti's testimony, however, the outcome would have likely been the same on remand. Judge Angeletti testified that no motion filed by Parler would have convinced him to vacate his order of default against Salomon. Angeletti Deposition, at p. 42. Furthermore, he testified that, all along, he was aware of the interlocutory nature of the default judgment. *Id.* Miles's argument, that Judge Angeletti would have changed his decision had he held a hearing, with knowledge of correct legal standard, is therefore unfounded.

Thus, because Judge Angeletti would have likely issued the default judgment again on remand, although this time following proper procedure, Parler's failure to forego settlement and appeal the default judgment, on *procedural grounds,* was not the proximate cause of any harm to Royal. This finding does not end the Court's inquiry, however. To support the conclusion that Parler was negligent in recommending a $1.6 million settlement, instead of abandoning settlement negotiations and pursuing an appeal, a discussion of the underlying purpose of default judgments in Maryland is necessary.

■ Under Maryland law, a default judgment is not meant to be a punitive measure that penalizes a party for breaching a procedural regulation. *See Curry,* 337 Md. at 434, 653 A.2d 934.[18] In distinguishing Maryland from other jurisdictions

that enter default judgments as a sanction for procedural violations, the Court of Appeals, in *Curry,* stated that "Maryland law... does not weigh the balance so heavily against the truth seeking function of adversary litigation." *Id.* at 434, 653 A.2d 934. The Court of Appeals further explained that "[i]n Maryland, a default judgment is considered more akin to an admission of liability than to a punitive sanction." *Id. See also Hopkins v. Easton Nat'l Bank,* 171 Md. 130, 134, 187 A. 874 (1936) (stating that a default judgment is "the tacit admission by the defendant in default of the truth of the allegations of the bill of complaint as they are averred"), *Pacific Mortgage & Inv. Group, Ltd. v. Horn,* 100 Md.App. 311, 332, 641 A.2d 913 (1994) ("[a] judgment by default constitutes an admission by the defaulting party of its liability for the causes of action set out in the complaint."); *Gotham Hotels, Ltd. v. Owl Club, Inc.,* 26 Md.App. 158, 173, 337 A.2d 117 (1975) ("failure to plead ... constituted an admission... of liability for the cause of action set forth in the declaration"). Moreover, Maryland courts have repeatedly held that a trial court's discretion to vacate default judgments "must be exercised liberally, lest technicality triumph over justice." *See, e.g., Eshelman Motors Corp. v. Scheftel,* 231 Md. 300, 301, 189 A.2d 818 (1963) (setting aside default judgment where defendant showed it had a meritorious defense and plaintiff did not claim it would be prejudiced), *Bliss v. Wiatrowski,* 125 Md.App. 258, 267, 724 A.2d 1264 (1999)(stating that the trial court's decision to vacate default judgment was consistent with the policy of liberal exercise of discretion). In fact, a close look at cases involving motions to vacate default judgments confirms that Maryland courts ordinarily exercise their discretion in favor of a defaulting party if the party establishes that there is a meritorious defense and shows that its fault was excusa-

---

**18.** Curiously, Miles does not cite to this case in support of its argument that an appellate court would have reversed Judge Angeletti's entry of a default judgment, even though it is very persuasive. Miles's expert witness, Melvin Sykes, however, does refer to it in his report.

ble. *See Triplin v. Jackson,* 326 Md. 462, 605 A.2d 618 (1992) ( holding that the trial court abused its discretion in refusing to vacate a default judgment where defendants filed affidavits ·stating they were not served with proper notice), *Eshelman, supra,* 231 Md. at 301, 189 A.2d 818, *Bliss, supra,* 125 Md.App. at 270, 724 A.2d 1264, *Ryan v. Johnson,* 220 Md. 70, 150 A.2d 906 (1959) (finding abuse of discretion in trial court's refusal to vacate default where defendant proffered meritorious defense), *Drummond v. Drummond,* 91 Md.App. 630, 635, 605 A.2d 657 (1992) (reversing trial court's decision to uphold default judgment in which the defendant made effort to have entry of default set aside). In the cases brought to the attention of the Court where the Maryland Court of Appeals upheld a trial court's refusal to vacate a default judgment, · the defaulting party either lacked a meritorious defense, or the trial court's discretion was confined under the old Maryland default judgment rule. *See Banegura v. Taylor,* 312 Md. 609, 620, 541 A.2d 969 (1988) (concluding that trial judge would have been justified in refusing to strike a default judgment, even if it was timely filed, because the defendant failed to allege that any defense existed), *Marine Midland Trust Co. of So. N.Y. v. State Nat'l Bank of Bethesda,* 268 Md. 503, 511–12, 302 A.2d 609 (1973) (affirming trial court's refusal to vacate default judgment under former Maryland default judgment rule because party could not show fraud, mistake, or irregularity).

Similarly, the Fourth Circuit had adopted a liberal view of discretionary relief from default judgments, particularly when the attorney, and not the party, is responsible for the error. *See Augusta Fiberglass Coatings v. Fodor Contracting,* 843 F.2d 808, 811 (4th Cir.1988) ("When the party is blameless and the attorney is at fault, the former interests control and a default judgment should ordinarily be set aside."), *United States v. Moradi,* 673 F.2d 725, 728 (4th Cir.1982) (holding that any doubt as to the propriety of granting relief must be resolved in favor of the party when the party is not responsible for the error that caused the default judgment). While Fourth Circuit law is not controlling in this case, it is nonetheless instructive.

Based on the facts of this case and the clear policy regarding the treatment of default judgments under Maryland law, this Court concludes as a matter of law that a Maryland appellate court would have reversed Judge Angeletti's decision to enter a default judgment. It is undisputed that Salomon had several meritorious defenses in the *Jerome* litigation, including *res judicata,* statute of limitations, and a general release. *See Burris v. Richards,* 79 Md.App. 554, 565, 558 A.2d 750 (1989) (holding that limitations is a meritorious defense for the purposes of a motion to vacate under Rule 2–613). Thus, the only real issue is whether it would have been equitable to vacate the default judgment.

Miles contends that while it made a conscious decision not to file a response by the deadline imposed by Judge Rombro, that decision was based on a mistaken belief that the time to respond was tolled while the case was pending in federal court. Miles argues that its active role in the litigation and the fact that it filed an answer in the Jerome case soon after the remand decision, and before Judge Angeletti entered the default judgment, justify a finding that it would have been equitable to vacate the default. Miles further maintains that it could not find any case in which a Maryland appellate court upheld a default judgment based on "such a technical failing of timely pleading." Finally, Miles claims that Jerome suffered no prejudice as a result of Salomon's failure to file a timely response to the complaint.

This case is unlike the cases on default judgments discussed above because it involves two defaults—the first was the fault of Salomon, the second was the fault of Miles. Furthermore, this Court does not agree with Miles's characterization of its conduct as a mere "technical failing of timely pleading." Miles missed the filing

deadline even though Jerome's counsel warned that removal was improper and that a response must be filed. Notwithstanding Miles's carelessness, this Court concludes that a Maryland appellate court would have reversed Judge Angeletti's decision to enter a default judgment.

Based on his testimony, it is clear that Judge Angeletti issued the default judgment to penalize Miles for its conduct, despite the existence of several meritorious defenses that would have absolved Salomon from liability. This decision was contrary to clear Maryland precedent that holds a default judgment is not meant to be a punitive sanction; rather, it is an admission of liability. Salomon never conceded liability in this case. Throughout the *Jerome* litigation, Salomon made tireless efforts to assert defenses that would have justified dismissal of the case against it. In issuing the default judgment, Judge Angeletti rejected the truth seeking function of adversary litigation in favor of punishment for a procedural error. The fact that Jerome alleged no prejudice [19] as a result of the default, coupled with the Maryland Court of Appeals' express repudiation of the practice of issuing default judgments as a penalty for procedural errors, supports the conclusion that Judge Angeletti's decision would not stand on appeal, even though it was in response to a second default. Having determined that Salomon would have prevailed on appeal, an examination of Parler's settlement recommendation is now warranted.

 Attorney negligence in settlement proceedings is adjudged under the same standard as any other negligence. *Thomas v. Bethea,* 351 Md. 513, 529, 718 A.2d 1187 (1998). In *Thomas,* the court emphasized that "lawyers [should] not be regarded as negligent simply because another lawyer, or even most lawyers, with the benefit of hindsight, would not have made the recommendation at issue." *Id.* In support of this statement, the court noted the subjective nature of the factors

that a lawyer must consider in formulating a settlement recommendation, and the subjective nature of the recommendation itself. *Id.* Moreover, the court acknowledged that a range for honest differences of opinion could legitimately exist in the context of settlement recommendations. *Id.* Thus, a lawyer cannot be held liable for negligence simply because there is a difference of opinion among lawyers as to how a particular case should be settled. *Parler & Wobber v. Miles & Stockbridge,* 359 Md. 671, 710, 756 A.2d 526 (2000). In addition, the key inquiry in an attorney negligence action involving settlement is not whether the attorney's advice and conclusions about the merits of the appeal were legally correct, but whether they were reasonable. *Ankney v. Franch,* 103 Md.App. 83, 652 A.2d 1138 (1995), *reversed on other ground,* 341 Md. 350, 670 A.2d 951 (1996).

 In this case, Maryland precedent regarding the treatment of default judgments was clear—default judgments are not punitive, but are an admission of liability. In fact, no party brought any cases to the attention of the Court wherein a party with a meritorious defense did not prevail on its motion to vacate. Thus, a reasonable attorney would have concluded that an appeal in this case would have been successful. As such, the only justification for Parler's settlement recommendation of $1.6 million, for a case that should have been dismissed, would have been the existence of other subjective factors. As discussed above, however, there is inadequate evidence to show that the factors identified by Parler as crucial to its settlement recommendation were actually of concern to Salomon. Absent evidence of other factors considered during the settlement process that would justify such a large settlement, this Court holds that no reasonable fact finder could conclude that Parler's settlement recommendation of $1.6 million was reasonable in light of the likelihood of a

---

**19.** *See* Jerome's Motion to Enter Default Judgment, dated April 13, 1998.

successful appeal of the default judgment. This is not simply a case in which there was a reasonable difference of opinion as to settlement value of a case. The underlying asbestos claim which is the center of this malpractice action should have been dismissed. Instead of appealing a procedurally and substantively erroneous decision at a minimal cost, Parler advised Royal to settle for nearly fourteen times the $125,000 that Jerome was originally willing to accept in settlement according to Mr. Amato. This advice was not reasonable. Accordingly, this Court holds that Parler was negligent as a matter of law. Furthermore, because an appeal of Judge Angeletti's decision to enter a default judgment would have been successful, this Court concludes, as a matter of law, that Parler's action contributed to Royal's harm.

**D. Right to Indemnification or Contribution**

In its third-party complaint, Miles seeks indemnification, or in the alternative, contribution from Parler for any damages assessed against it in this action. Based on the circumstances of this case, Miles is not entitled to indemnification from Parler, but is entitled to contribution for any damages it incurs.

■■■■ As Parler correctly states in its motion for summary judgment, Miles's indemnification claim must be predicated on a tort-based theory of indemnification, because there is no contractual relationship between Parler and Miles that would give rise to either express or implied contractual indemnification. *See Hanscome v. Perry,* 75 Md.App. 605, 615–17, 542 A.2d 421 (1988). A party has a right to tort-based indemnification when, without personal fault, it "has become subject to tort liability for the unauthorized and wrongful conduct of another." *Id.* at 617, 542 A.2d 421 (quoting Restatement of Restitution § 96). Maryland, among other jurisdictions, interprets the "without personal fault" language of the Restatement liberal-

ly, allowing a passively negligent party to enforce an implied right of indemnification against a party liable for active negligence. *Id.* A party liable for active negligence cannot, however, obtain tort-based indemnification under Maryland law. *See Franklin v. Morrison,* 350 Md. 144, 163, 711 A.2d 177 (1998). Thus, "[i]f the [plaintiff's] complaint alleges conduct that constitutes active [wrongdoing] on the part of the party seeking indemnification, or if it is clear from circumstances revealed in the complaint that liability would only arise from proof of active [wrongdoing], there is no basis for an indemnification claim." *Hartford v. Scarlett Harbor,* 109 Md.App. 217, 278, 674 A.2d 106 (quoting *The Board of Trustees of the Baltimore County Colleges v. RTKL Associates,* 80 Md.App. 45, 56, 559 A.2d 805 (1989)). The underlying purpose of indemnification is to allow a party who is held liable for an injury, but who was not primarily responsible for the injury, to shift liability to the party who was primarily culpable for the loss suffered by the plaintiff. *Hartford,* 109 Md. App. at 277, 674 A.2d 106. A typical example of a situation justifying indemnification is when an employer is held liable, under the doctrine of *respondeat superior,* for a tort committed by its employee. *Id.* at 278, 674 A.2d 106.

■■■■ Miles concedes that contribution rather than indemnification is the principal theory of its third-party complaint. *See* Miles's Opposition to Third–Party Defendant's Motion for Summary Judgment, at p. 5. Nevertheless, Miles argues that indemnification remains a viable theory if this Court finds that Parler's failure to file third-party claims contributed solely to Royal's injury, or if Parler's failure to pursue an appeal and negligent settlement advice was the primary cause of Royal's injury. These arguments are without merit. First, this Court has found that Parler's failure to file third-party claims was not the proximate cause of Royal's injury. *See discussion, supra* part II. B. Thus, Miles cannot seek indemnification on

that basis. Second, and more significantly, no reasonable fact finder could possibly conclude that Miles was only passively negligent in failing to respond to Jerome's complaint and in causing the entry of a default judgment. Miles's negligence was not secondary to the negligence of Parler in advising settlement, or merely passive; rather Miles's repeated incompetence was active negligence that created this situation in the first place. While Parler should not have advised Royal to settle for $1.6 million, Miles is not entitled to indemnification simply because Parler did not succeed in untangling the web woven by Miles. As stated above, indemnification is permitted in situations where a party who is without fault, or whose negligence is minimal, is held liable instead of the primary wrongdoer. This is clearly not one of those situations. This Court does not hesitate to find that no reasonable fact finder could conclude that Miles's repeated shortcomings in its representation of Royal constituted only minimal negligence. Miles's argument for indemnification is totally devoid of merit.

██ Miles can still maintain its claim for contribution against Parler, under the Maryland Uniform Contribution Among Joint Tort–Feasors Act, as this Court has found that Parler's negligence in recommending settlement for $1.6 million when an appeal would have been successful contributed to Royal's injury. The ability of former counsel to sue successor counsel based on the successor counsel's negligence in settlement proceedings—negligence that contributed to the damages for which the former counsel had been sued—was expressly recognized by the court of appeals in this very case, upon certification of the issue by this Court. *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 709–10, 756 A.2d 526 (2000). The amount of contribution to which Miles is entitled will be reserved for the trier of fact.

The Court is aware that Miles has not yet moved for summary judgment on its third-party claims. It is anticipated that Miles will move for summary judgment on the issue of contribution soon after this decision is rendered.

### CONCLUSION

For the reasons stated, Royal's Motion for Summary Judgment on the issue of third-party claims is DENIED. On all other claims, Royal's Motion for Summary Judgment is GRANTED. Miles's Motion for Summary on the issue of third-party claims is GRANTED. On all other claims, Miles's Motion for Summary Judgment is DENIED. Finally, on the issue of indemnification, Parler's Motion for Summary Judgment is GRANTED. On the issue of contribution, Parler's Motion for Summary Judgment is DENIED.